## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| AMIT ARORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 C 4443 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| NAV CONSULTING INC., d/b/a/ NAV | ) | |
| FUND ADMINISTRATION GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Amit Arora brings this lawsuit against Defendant Nav Consulting Inc., d/b/a/ Nav Fund Administration Group ("NAV"), alleging discrimination during his employment based on race, ethnicity, national origin, and citizenship status in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/2-102.[1] NAV has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] Because no reasonable jury could find for Arora on any of his viable claims, the Court grants NAV's motion.

---

[1] Arora also brought an ethnicity and race discrimination claim pursuant to 42 U.S.C. § 1981 against NAV and Nav Gupta. The Court dismissed this claim on October 13, 2022, meaning that Gupta no longer remains a party in this case. Doc. 52.

[2] The parties filed their briefs and accompanying exhibits under seal, with Nav also providing redacted versions. The Court orders Arora to file a redacted version of his response brief on the docket. If the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

## BACKGROUND[3]

I.      **Arora's NAV Employment**

Arora, a permanent U.S. resident and green card holder, was born in India and identifies as Asian and Indian, referring to himself as Ethnic-Indian.  Arora earned his bachelor's degree in commerce from the University of Rajasthan in Jaipur, India in 2000 and his master's degree in commerce from the same university in 2003.  Arora also earned a master's degree of business administration ("MBA") from Benedictine University in 2011 or 2012.  Arora is not a Chartered Accountant ("CA"), Chartered Financial Analyst ("CFA"), or a Certified Public Accountant ("CPA").

NAV, based in Oakbrook Terrace, Illinois, is a fund administrator that provides services, including registrar and transfer agency functions, to hedge funds, private equity funds, and other entities.  Nav Gupta is the founder and chief executive officer of NAV.  NAV has between thirty to forty-five employees working directly for it and contracts other work to its affiliate, NAV Back Office IT Solutions Private Limited, in India.  While NAV focuses mainly on client relationships, NAV Back Office performs most of the data processing for NAV's clients.  Approximately 2,500 people work at NAV Back Office.

Arora began working for NAV Back Office in Jaipur, India in 2003.  He transferred to NAV's Oakbrook Terrace office in 2004 as an account manager in its fund accounting department.  Arora came over to the United States on an H-1B visa, which NAV sponsored.  NAV paid the application fees and legal costs associated with the visa along with the costs

---

[3] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, the additional facts included in Arora's response, and the exhibits attached to both.  The Court has included in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.  The Court takes all facts in the light most favorable to Arora, the non-movant.

corresponding with moving Arora to the United States.[4]  Arora initially lived in company-owned housing, where he paid rent.  He stayed in company-owned housing for approximately four years, sharing it with other NAV employees.  Gupta further provided Arora with interest-free loans to help him purchase a car and a house.

As a condition of employment, NAV required Arora and other H-1B employees to enter into employment agreements with NAV.  The employment agreements included restrictive covenants and liquidated damages provisions if an employee voluntarily resigned.  The liquidated damages provision required the employee to pay NAV the equivalent of one year of his salary.  The agreements alternatively required NAV to pay an employee four months' salary if it terminated the employee without cause and included a cure provision if NAV terminated an employee with cause.  Arora first signed an employment agreement with NAV on October 16, 2004, which had a three-year term.  Arora next signed an employment agreement with NAV on June 18, 2007, around the time that NAV applied for Arora's permanent residency.[5]  After the second agreement expired, Arora did not sign another employment agreement with NAV until July 1, 2018, soon after Arora notified NAV that the priority date for his green card application had become current.  The 2018 agreement was again for a three-year term.  Arora received his green card in April 2019.

In November 2015, Arora's title changed to senior account manager ("SAM").  SAMs had more experience than account managers, but their job responsibilities were essentially the same.  NAV also employed assistant vice presidents ("AVPs"), whom NAV evaluated to have

---

[4] NAV also paid the immigration fees for Arora's wife to come to the United States.

[5] The parties have not introduced the employment agreements into the record, and some discrepancy exists as to the length of the agreements, with Arora representing that the second agreement had a five-year term, while Gupta testified it had a three-year term despite one spot in the agreement that referred to a five-year term.

more experience, or better credentials, qualifications, or work experience than SAMs. Aside from the different title, AVPs and SAMs had the same job duties. As a SAM, Arora managed over 130 client accounts. Gupta testified, however, that workload could not be measured by the number of accounts alone, and that many of Arora's accounts did not require much maintenance.

According to Arora, he had an "up[ ] and down[ ]" relationship with Gupta while working for NAV. Doc. 83-1 at 26. Arora testified that Gupta taunted him for not being a CA and had him perform networking tasks that were not part of his job description. Arora also complains of other alleged discrimination he and other Ethnic-Indian employees faced. For example, in the summer of 2014, NAV moved offices. Arora recalled that he and at least all the other Ethnic-Indian employees helped with NAV's office move. Non-Ethnic-Indian employees also helped with the move too, however. When Gupta's parents passed away in 2019, Arora helped organize the funerals and transported some of Gupta's family members who came over from India for the funerals. Other Ethnic-Indians also helped with these tasks. Additionally, NAV's employee handbook encouraged all employees to conduct their conversations in English only. Gupta explained that NAV imposed this requirement so that all staff members could participate in work-related conversations, not just those who spoke a different language. Ambuj Garg, in his capacity as Vice President at NAV, also sent an email to all Hindi speakers in October 2018, reminding them that they should speak English in the workplace.

Arora did not apply for a promotion at NAV between 2016 and 2020. According to NAV, no open positions or promotions were available over that time period, but NAV did at least change various employees' titles. Arora testified that NAV did not have a set policy for promotions, with Gupta making all the decisions. Arora also testified that he spoke with Gupta about why NAV did not promote him, with Gupta typically brushing off the questions. Arora

believed that Gupta wanted to promote Caucasian employees so as to present NAV to outsiders as a local, U.S.-based company instead of one mainly run by Indians. Garg, who rose from Vice President to NAV's chief operating officer in mid-2020, testified that employees did not have to request a promotion in order to receive one. But at the same time, he testified that Arora's title never changed because Arora did not request such a change, in addition to the fact that Arora did not have CFA, CA, or CPA credentials or other industry experience.

Beginning in 2018, NAV adopted a more formal review process, with employees first performing self-assessments and then meeting with Garg and Niru Patel, NAV's chief people and compliance officer, to discuss their performance. Gupta then received the reviews and made final decisions regarding salaries and bonuses, holding one-on-one meetings with the employees to inform them of the decisions. According to Gupta, NAV determines salaries by looking at an employee's experience and credentials, as well as other factors. In 2018, Arora earned $126,700, in addition to a $6,000 bonus.[6] In 2019, his overall salary was $132,700 and he also received a $6,000 bonus. In 2020, his yearly salary was $140,200.

Arora submitted his notice of resignation to NAV on January 31, 2020. Although Arora gave two months' notice, Gupta testified that he requested that Arora stay on for six months. Arora ultimately stopped working for NAV on March 31, 2020. Arora then went to work at SFS Formidium as an executive vice president. Nilesh Sudrania, SFS' CEO, previously worked at NAV. Arora later filed an EEOC Charge on December 17, 2020, alleging that NAV treated Arora less favorably than his co-workers who were not from India.

---

[6] According to Gupta, the salary amounts NAV provided in this litigation for Arora and other employees include benefits that NAV provided to its employees, including 401k contributions and healthcare benefits.

## II.  Other NAV Employees

At the time of Arora's resignation, he was one of eight SAMs in NAV's fund accounting department, six of whom were Ethnic-Indians.  The SAM NAV paid the most that year was Kurt Koeplin, a non-Ethnic-Indian employee.  Koeplin is a CPA who served as the chief operating officer and chief financial officer for a capital management firm from 2008 until he joined NAV. Koeplin also had over twenty years of relevant experience.  But in one of Koeplin's performance reviews, management noted that he needed to focus more on work, as he had sent several emails to the wrong email addresses, did not always follow organizational policies and procedures, and could contribute more based on his experience.  In 2018, Koeplin earned $183,000 in salary and $7,500 in bonuses.  In 2019, Koeplin's salary was $195,500, and he again received a $7,500 bonus.  Koeplin's 2020 salary was $201,500.

Abhishek Kumawat, an Ethnic-Indian, was the next highest-compensated SAM in 2020, with an overall salary of $168,000.  In 2018, he earned $143,000 in salary and $8,000 in bonuses.  In 2019, Kumawat had an overall salary of $155,500, and he received a $6,624 bonus.

Next, Bhavana Bansal, another Ethnic-Indian SAM, earned $158,775 in 2020.  Her salary in 2018 was $130,775, and she received an $8,000 bonus that year.  In 2019, her salary was $158,775, and she again received an $8,000 bonus.

Rajat Jain, also an Ethnic-Indian SAM, earned $153,293 in 2020.  In 2018, his overall salary was $123,293, and he received a $9,000 bonus.  In 2019, his salary was $138,293, and he received a $7,831 bonus.

Arora's 2020 salary of $140,200 fell between that of Jain and Chandra Mohan, another Ethnic-Indian SAM.  Mohan's 2020 salary was $135,336.  He received a $112,336 salary and $6,000 bonus in 2018.  In 2019, his salary was $124,336, and he received a $6,000 bonus.

Deepak Middha, also an Ethnic-Indian SAM, earned $135,149 in 2020. He received $117,149 in salary and an $8,000 bonus in 2018. In 2019, Middha's salary was $127,149, and his bonus was $6,388.

Paul Johnson, a non-Ethnic-Indian SAM, earned the least of all SAMs in 2020, with a salary of $94,166, considerably less than any of the other SAMs. In 2018, Johnson's salary was $90,166, and he received a $2,000 bonus. In 2019, his salary was $92,166, and he received a $3,500 bonus. Johnson is not a CPA or CFA. He handled only 29 accounts in 2016, although according to Gupta, Johnson's main responsibilities consisted of handled registrar and transfer duties for complex transactions.

Additionally, John Orr, who is not Ethnic-Indian, worked as a SAM from at least 2016 to 2018. He is not a CPA or CFA. Orr earned less than Arora between 2016 and 2018, with his 2018 salary set at $119,666. Orr only handled five accounts in 2016. But Gupta explained that Orr also served as a consultant for the entire fund accounting department, specializing in complex tax issues.

The parties also provide information about four AVPs, only one of whom was Ethnic-Indian. Chris Rakers, one of the non-Ethnic-Indian AVPs, has an MBA. Before NAV, Rakers worked as the chief information officer and chief operating officer for a fund services firm equivalent in size to NAV. According to Gupta, Rakers successfully brought to NAV marketing efforts, experience, and client relationships. At the time of his resignation in 2018, Rakers' salary was $188,500.

Sam Crispino, also a non-Ethnic Indian AVP, has an MBA and is a CPA and CFA. He had over twenty years of experience and served as a controller for another company for several years before joining NAV. According to Gupta, Crispino had excellent client skills, having

7

successfully talked a client into staying at NAV. In 2018, Crispino earned $204,000 in salary and $6,500 in bonuses. In 2019, Crispino's salary was $214,000, and he also earned a $6,500 bonus. In 2020, Crispino earned $228,000 in salary.

Brooke Gottshall, another non-Ethnic-Indian AVP, has an MBA and is a CPA and CFA. Before joining NAV, he served as the chief financial officer and chief compliance officer for a capital management firm. According to Gupta, Gottshall's experience, skills, and ability to independently solve problems made Gottshall a valuable NAV employee. Further, Gupta testified that Gottshall was only one of three people at NAV with valuation expertise, which Gupta considered the most important skill for employees in the fund accounting department to have. At the same time, Garg did not necessarily consider Gottshall an expert in any area, also noting that Gottshall had some inconsistent years. Gupta acknowledged that NAV moved some clients from Gottshall after complaints, and Garg had emailed Gottshall about missing a client meeting and needing frequent reminders of tasks to do. In 2018, Gottshall earned a $175,000 salary and a $7,500 bonus. In 2019, Gottshall earned $190,000 and a $7,500 bonus. And in 2020, Gottshall earned $190,000.

Manish Saraf, the only Ethnic-Indian AVP, is a CA. Gupta testified that Saraf progressed well at NAV and had the ability to handle complex problems. In 2018, Saraf's salary was $168,535, and he also received a $9,000 bonus. In 2019, Saraf's salary was $183,535, and he received a $9,000 bonus. In 2020, his salary was $198,535.

Although NAV entered into contracts with specific terms of years for some of its Caucasian employees, the majority of Caucasian employees were instead at-will employees not subject to liquidated damages provisions if they voluntarily left NAV's employ before the term expired. Several Caucasian employees, including Rakers and Gottshall, did not have non-

8

competes.  Although NAV brought an arbitration proceeding to enforce Arora's employment agreement, NAV has never brought claims in arbitration against any American-born employee who has voluntarily resigned.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018).  In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).  The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).  However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.     Scope of Claims

The parties initially disagree as to the scope of the claims Arora pursues.  NAV maintains that Arora's first amended complaint only gives rise to claims for failure to promote and discriminatory pay.  NAV further argues that Arora's claims are limited to actions occurring within the 300-day period prior to Arora's filing of his EEOC charge, in other words, from February 21, 2020 to December 17, 2020.  Arora, on the other hand, contends that he has not brought separate claims for discrete acts such as failure to promote or pay discrimination and that he instead claims that NAV discriminated against him by creating a hostile work environment for him and other Ethnic-Indian employees.  Because hostile work environment claims involve repeated conduct, Arora maintains that as long as one act occurred within the statutory time period, the Court can consider all actions contributing to the hostile work environment.

NAV objects to Arora's hostile work environment theory, contending that he cannot raise such a theory for the first time in his response in an attempt to stave off summary judgment. Although Arora did not use the phrase "hostile work environment" in his first amended complaint, he need not have done so in order to pursue such a theory as long as his allegations placed NAV on notice of this theory.  *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 851 (7th Cir. 2015); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2015).  And the Court finds that he did so.  The first amended complaint details the alleged exploitation and mistreatment of Arora and other Ethnic-Indian employees, complaining about the "tenement-like conditions" in which NAV housed him, Doc. 10 ¶ 13, the pressure to "provide free labor for tasks unrelated to job duties," *id.* ¶ 14, and NAV's intentional delay of the immigration process to keep Arora subject to its control, *id.* ¶ 15.  Arora further alleged that NAV "handcuff[ed]

10

[him] with exploitative contracts for years." *Id.* at 7. Finally, in his request for relief, Arora sought an order permanently enjoining NAV from "mistreating, exploiting, or otherwise discriminating against Ethnic-Indian employees" by prohibiting their mistreatment. *Id.* at 13. And, in ruling on NAV's motion for judgment on the pleadings, the Court acknowledged that Arora complained of mistreatment based on NAV's housing of him and other Ethnic-Indian employees in crowded conditions, requiring them to perform unpaid, non-hedge-fund-related work for NAV and Gupta, requiring them to sign one-sided employment contracts, and delaying Arora's permanent residency process. Doc. 52 at 2. To clarify any remaining doubt, in response to NAV's summary judgment motion, Arora has explicitly stated that he pursues a hostile work environment claim. *See Hackett v. City of S. Bend*, 956 F.3d 504, 509 (7th Cir. 2020) ("At summary judgment, though not necessarily in a complaint, a plaintiff needs to spell out these distinct theories separately, at least to the extent that the brief gives the district judge fair notice that the theory is being asserted."). Thus, the Court finds it appropriate to consider Arora's hostile work environment theory.

That does not end the inquiry, however. In a deferral state, like Illinois, a plaintiff has a 300-day window to file an EEOC charge concerning an alleged unlawful employment practice for a Title VII claim based on those practices to be actionable. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014) ("If a plaintiff does not file a charge concerning a discrete act within the 300-day window, her claim is time-barred and she may not recover."); *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) ("A charge of employment discrimination must be filed with EEOC within 300 days of the alleged unlawful employment practice."); *Henry v. Ford Motor Co.*, No. 22 C 4528, 2023 WL 4492388, at *2 (N.D. Ill. July 12, 2023) (IHRA

claim requires filing of a charge with the EEOC or IDHR within 300 days of the occurrence of the alleged unlawful employment practice (citing 775 Ill. Comp. Stat. 5/7A-102(A)(1))).

Failure to promote qualifies as a discrete act, so Arora can only recover for any alleged failure to promote that occurred between February 21, 2020 and his last day of employment at NAV, March 31, 2020. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. . . . Morgan can only file a charge to cover discrete acts that 'occurred' within the appropriate time period."). Although Arora contends that NAV passed him up for promotions throughout his career there, he cannot use the continuing violation theory to make any alleged failure to promote that falls outside the statutory limitations period actionable. *See Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) ("A Title VII plaintiff seeking redress for a series of discrete discriminatory acts [such as failures to promote] cannot avoid the effect of the limitations period by arguing that the discrete acts are 'plausibly or sufficiently related.'" (quoting *Morgan*, 536 U.S. at 111–14)); *Beamon v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 860 (7th Cir. 2005) ("[D]iscrete discriminatory employment actions such as termination, failure to promote, denial of a transfer, or refusal to hire are deemed to have been taken on the date they occurred, even if they form part of an ongoing practice or are connected with other acts."); *Anbudaiyan v. Ill. Dep't of Fin. & Pro. Regul.*, No. 11 C 8893, 2012 WL 2525696, at *4 (N.D. Ill. June 29, 2012) (separate promotion denials did not form a part of a single continuing violation because failure to promote constitutes a separate actionable unlawful employment practice).

As for Arora's pay disparity claim, the Lilly Ledbetter Fair Pay Act of 2009 provides that "an unlawful employment practice occurs not only when a discriminatory compensation decision

or other practice is first adopted or when an individual first becomes subject to that decision or

practice, but also 'when an individual is *affected* by application of a discriminatory compensation

decision or other practice, including each time wages, benefits, or other compensation is paid,

resulting in whole or in part from such a decision or other practice.'" *Poullard v. McDonald*,

829 F.3d 844, 853 (7th Cir. 2016) (quoting 42 U.S.C. § 2000e-5(e)(3)(A)). Because Arora

would have received at least one paycheck after February 21, 2020, his disparate pay claim

avoids the statutory time bar. Further, as NAV acknowledges, if he succeeds on his disparate

pay claim, under the Fair Pay Act, Arora may recover back pay for up to two years preceding the

filing of his charge (in other words, from December 17, 2018 through the end of his employment

on March 31, 2020). 42 U.S.C. § 2000e-5(e)(3)(B).

As for the timeliness of Arora's hostile work environment claim, the Court may consider

the entirety of an employer's behavior to assess the plausibility of the claim as long as one

contributing act took place within the statutory period. *Morgan*, 536 U.S. at 117 ("A hostile

work environment claim is composed of a series of separate acts that collectively constitute one

'unlawful employment practice.' . . . Provided that an act contributing to the claim occurs within

the filing period, the entire time period of the hostile environment may be considered by a court

for the purposes of determining liability." (citation omitted)). Arora contends that NAV

subjected him to a hostile work environment by requiring him to sign one-sided employment

contracts, take on non-work related duties, speak only English in the office, and abstain from

contacting the lawyers working on his immigration matters.[7] But Arora fails to point to any

alleged harassment that occurred after February 21, 2020 so as to allow Arora to proceed on this

---

[7] Arora also alludes to NAV intimidating him through employment reviews, Doc. 87 at 6, but he fails to expound on what he means by this. The record does not indicate that Arora received an employment review between February 21, 2020 and his last day of work, nor does it suggest any basis for finding that the review process intimidated Arora.

claim. Specifically, he last signed an employment contract in 2018. The non-work related duties of which he complains occurred in 2014 (helping with an office move) and 2019 (picking up Gupta's family from the airport for Gupta's parents' funerals). NAV implemented the policy requiring speaking English for work-related conversation in the office in 2018, and Arora has failed to provide any evidence that NAV enforced it in 2020. Finally, Arora acknowledges receiving his green card in 2019, and he provides no basis for finding that he had any need to contact NAV's immigration lawyers in 2020. Thus, because Arora has not pointed to any alleged harassment that occurred during the statutory time period, he cannot proceed with a hostile work environment theory.[8]

In summary, Arora may only potentially recover for a failure to promote between February 21 and March 31, 2020, and any pay disparity that allegedly existed between December 17, 2018 and March 31, 2020. The Court now turns to whether he has mustered sufficient evidence to allow these claims to proceed to a jury.

---

[8] Even assuming that Arora's hostile work environment claim was timely, the record would not allow a reasonable jury to find for him on this theory. An employer violates Title VII when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (alteration omitted) (citation omitted) (internal quotation marks omitted). Deciding whether conduct is sufficiently severe or pervasive to support a hostile work environment claim requires the Court to examine the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014). Here, the conduct Arora points to does not reach the high bar required by the Seventh Circuit for actionable harassment. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 882 (7th Cir. 2018) ("Scott certainly crossed far beyond the line of acceptable workplace etiquette, but his actions were not as offensive as this Court has required to constitute a hostile or abusive work environment."). Nor has Arora provided any evidence of how the alleged harassment interfered with his work. *See Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (conduct "must be so severe or pervasive as to alter the terms or conditions of the employment relationship").

## II.     Merits of Arora's Discrimination Claims

To prove his Title VII and IHRA discriminatory failure to promote and pay disparity claims, Arora must demonstrate that the evidence, considered as a whole, would permit a reasonable factfinder to conclude that his race, ethnicity, national origin, or citizenship status caused the failure to promote or pay disparity. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) ("Illinois courts apply the federal Title VII framework to claims of discrimination made under the [IHRA]."). Prior to *Ortiz*, courts distinguished between "direct" and "indirect" methods of analyzing discrimination claims. *Ortiz*, 834 F.3d at 763–64. *Ortiz*, however, eliminated this distinction and directed courts to ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the [adverse employment action]." *Id.* at 765.

### A.     Failure to Promote

NAV argues that Arora cannot establish that he applied for and NAV rejected him for an open position, meaning he cannot point to an adverse employment action. A *prima facie* case for failure to promote typically requires a plaintiff to produce evidence showing that: (1) he belonged to a protected class, (2) he was qualified for the position sought, (3) the employer rejected him for the position, and (4) the employer promoted someone outside of the protected class who was not better qualified for the position. *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016). But when an employer "does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion," a plaintiff only needs to establish "that the employer's decision not to approach people of her status was itself illegitimately motivated and

15

that but for such a practice she likely would have been approached," and that she would have taken the job if offered it. *Loyd v. Phillips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994).

Here, a reasonable jury could find that NAV did not formally solicit applications for promotions, instead making unilateral decisions as to whom to promote. NAV argues that no promotions existed between 2016 to 2020, but the record indicates that NAV changed the titles of several employees, including Crispino, Gottshall, and Rakers, from SAM to AVP over this period. And although NAV maintains that AVPs had the same duties as SAMs, at least a question of fact exists as to whether the title change amounted to a promotion. Thus, the fact that Arora never applied for a promotion is not fatal to his claim.[9] *See Sughayer v. Fifth Third Bank, N.A.*, No. 1:20-CV-06327, 2023 WL 6388252, at *8 (N.D. Ill. Sept. 29, 2023) (rejecting requirement that an employee apply for a promotion where the "employer had no application process" for the position and instead "promotions were recommended by Regional Managers . . . and approved by [their] superiors").

That said, in order to succeed on a failure to promote claim where no application process existed, Arora must demonstrate that he would have taken the promotion if offered. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367–68 (1977) ("Because [a nonapplicant] is necessarily claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices."); *Turner v. City of Chicago Bd. of Educ.*, No. 17 C 6507, 2019 WL 1953113, at *5 (N.D. Ill. May 2, 2019) ("[A] nonapplicant asserting a Title VII claim must allege not only that a discriminatory practice prevented her from applying for employment, but also that, absent the employer's discriminatory conduct, she 'would have

___
[9] The Court does note, however, that the record does not indicate that NAV actually promoted anyone between February 21 and March 31, 2020, calling into question whether any promotions were available during the actionable statutory time period.

16

sought the position.'" (quoting *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 384 (7th Cir. 2016))). His claim, limited to the potential for a promotion between February 21 and March 31, 2020, fails on this ground. Arora submitted his resignation to NAV on January 31, 2020. And he has not proffered any evidence that he would have accepted a promotion had NAV offered it to him after he had already resigned from the company. Absent such evidence, Arora's failure to promote claim fails.

### B.      Disparate Pay

Moving on to Arora's disparate pay claim, NAV does not dispute that pay disparities existed among SAMs and AVPs. But the mere existence of a pay disparity does not allow Arora's claim to reach a jury. *See Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 810 (7th Cir. 2014) ("Tank assumes that because his alleged comparators were also T-Mobile regional VPs, the fact that he was paid less is enough to survive summary judgment. It is not."). Instead, Arora must show that his race, ethnicity, national origin, or citizenship status caused NAV to pay his non-Ethnic Indian co-workers more than him. *Palmer v. Indiana Univ.*, 31 F.4th 583, 589 (7th Cir. 2022). Arora may demonstrate causation through evidence of, for example, comments or animus toward his protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for the pay disparity. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) ("We have identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment."). Arora focuses on evidence of

allegedly similarly situated non-Ethnic Indian employees who received higher salaries and pretext.

"To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was 'directly comparable to her in all material respects' so as to 'eliminate other possible explanatory variables.'" *Downing v. Abbott Lab'ys*, 48 F.4th 793, 805 (7th Cir. 2022) (quoting *Williams v. Off. of Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016)). Typically, a plaintiff must at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012).

Arora contends that Crispino, Gottshall, and Koeplin serve as appropriate comparators for his disparate pay claim, while NAV maintains that they do not. Crispino and Gottshall were AVPs, a step up in job title, but NAV witnesses acknowledged that AVPs had essentially the same job duties as SAMs. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) ("job title alone is not dispositive" where the employees had the same responsibilities). Nonetheless, these individuals do not serve as proper comparators because they had different experience, credentials, and qualifications than Arora. *See Rucker v. Ill. Dep't of Child. & Fam. Servs.*, 326 F. App'x 397, 399 (7th Cir. 2009) (employees not comparable despite holding the same title and reporting to the same supervisor where, among other things, the comparator "had more relevant work experience" to justify his higher salary). Arora had his MBA and had worked solely for NAV. Although holding the same title as Arora, Koeplin was a CPA and had worked as the chief operating officer and chief financial officer for a capital management firm before joining NAV. Gottshall had an MBA, CPA, and CFA. Prior to joining NAV, he had

18

served as the chief financial officer and chief compliance officer for a capital management firm and, according to Gupta, had valuation expertise, something only three people at NAV had. Crispino had an MBA, CPA, and CFA and also had served as a controller for a different company prior to joining NAV and had over twenty years of relevant experience. These differences mean that Crispino, Gottshall, and Koeplin cannot serve as proper comparators. *See Tank*, 758 F.3d at 810 (plaintiff did not identify proper comparators where he "point[ed] to no evidence that shows that [the alleged comparators] . . . had comparable experience, education, or qualifications"); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (an employee was not similarly situated to the plaintiff where, among other things, he "had different qualifications and experience").

Moreover, even assuming that Arora has identified a proper comparator, he has presented no evidence that NAV's rationale for the pay disparities amounts to pretext. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Arora can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' [the pay disparity], or indirectly by showing that [NAV's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness, not the accuracy, of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

19

NAV represents that Gupta set salaries based on employees' experience, qualifications, expertise, and role in the company. Arora takes issue with Gupta's evaluations of other employees, pointing out that Gottshall and Koeplin's performance reviews highlighted areas of concern. But while Arora may disagree with Gupta's evaluation of his skills and credentials when compared to those paid more than him, he has not presented any evidence that would undermine Gupta's explanation for the disparities. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) (in "discussing the nature of the pretext inquiry, [the court has] stated that it is not enough for a plaintiff to show that his employer's explanation was based on an inaccurate assessment of its employee's performance"); *Walker v. Glickman*, 241 F.3d 884, 890 (7th Cir. 2001) ("[T]he court's role is not to determine whether [the employer's] decision was right, but whether [the employee] presented sufficient evidence that [the employer's] reason was a lie for the action it took."); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (the plaintiff could not create an issue of fact by claiming he was performing adequately or by challenging his supervisors' assessment of his performance). And because the Court does not sit as a "'super personnel department' that second-guesses employers' business judgments," *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted), the Court cannot interfere with NAV's compensation decisions, *see Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair.").

Additionally, as NAV points out, Arora earned more than two non-Ethnic Indian SAMs (Orr and Johnson) and two Ethnic-Indian SAMs (Mohan and Middha). Three Ethnic-Indian SAMs (Jain, Bansal, and Kumawat) earned more than Arora, and the second-highest

compensated AVP at NAV in 2020 (Saraf) shares Arora's protected characteristics. If anything, the fact that other Ethnic-Indians in the same or similar roles earned more than Arora and non-Ethnic Indians in the same role earned less supports NAV's explanation that it based salaries on experience, qualifications, expertise, and company roles, not on race, ethnicity, national origin, or citizenship status. Thus, while a distribution of salaries exists at NAV, with Arora receiving less than some non-Ethnic-Indian employees, a reasonable jury could not conclude that Arora's race, ethnicity, national origin, or citizenship status caused the disparity.[10] *See Palmer*, 31 F.4th at 592 (Easterbrook, J., concurring) ("All the difference shows is a distribution of incomes; it does not imply that, if Gildea and Palmer were the same race, Palmer would be the highest-paid lecturer. But if Palmer is right, then every lecturer at the Kelley School (other than Gildea) is a victim of racial discrimination, because all are paid less than some other lecturer of a different race."). Therefore, his pay disparity claim fails. *See Beaulieu v. NewQuest Mgmt. of Ill., LLC*, No. 17-CV-05672, 2021 WL 4502163, at *6 (N.D. Ill. Sept. 30, 2021) ("Without any evidence that race—rather than a combination of seniority, 'band progression,' and merit increases—caused Anderson's pay to be higher than Beaulieu's, a reasonable jury could not conclude from the evidence as a whole that NewQuest engaged in discriminatory pay practices."), *aff'd*, No. 21-3001, 2022 WL 989360 (7th Cir. Apr. 1, 2022).

---

[10] Although Arora could use pattern and practice evidence to show pretext, *see Bell v. Env't Prot. Agency*, 232 F.3d 546, 553 (7th Cir. 2000) ("[E]vidence of systemic disparate treatment is relevant to and probative of the issue of pretext[.]"); *Palmer*, 31 F.4th at 592 (Easterbrook, J., concurring) (acknowledging that to prove a claim of pay discrimination, a plaintiff may use evidence "compar[ing] the median income of one ethnicity or sex against the median of another" or "construct[ing] a statistical model that would reveal the weights" an employer gave to certain factors "so that any effect of race or sex could be isolated"), he has not provided any statistical or other pattern-type evidence concerning NAV's treatment of other Ethnic-Indian employees that would be relevant to the pretext inquiry.

## CONCLUSION

For the foregoing reasons, the Court grants NAV's motion for summary judgment [82].

The Court enters judgment for NAV on the first amended complaint and terminates this case.


Dated: November 1, 2023

                                                     
SARA L. ELLIS
United States District Judge